UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALBERT DEJEWSKI,

        *Plaintiff,*

    v.

NATIONAL BEVERAGE CORP. and
JOSEPH CAPORELLA,

        *Defendants.*

Civil Action No. 19-cv-
14532 (MEF)(CLW)


<u>OPINION and ORDER</u>

\*     \*     \*

I.    <u>Background</u>
    A.  <u>The Parties</u>
    B.  <u>The Evidence</u>
    C.  <u>The Lawsuit</u>
    D.  <u>This Motion</u>
    E.  <u>The Court's Approach</u>
II.  <u>Summary Judgment Standards</u>
III. <u>The New Jersey CEPA</u>
    A.  <u>"Reasonably Believes"</u>
    B.  <u>The Statute</u>
    C.  <u>Objecting</u>
    D.  <u>Insubordination</u>
IV.  <u>Front-Pay Damages</u>
V.   <u>Conclusion</u>

\*     \*     \*

An employee was fired.

He sued, claiming he was fired for raising a concern about an assertedly inaccurate public statement his employer was planning to make.

The defendants, the former employer and its president, now move for summary judgment.

The motion is denied.

\*       \*       \*

## I.   Background

### A.   The Parties

The defendants are the National Beverage Corp. ("the Corporation") and Joseph Caporella, the then-President of the Corporation ("the President").  See Complaint ¶¶ 1, 3.

The Corporation makes and sells drinks under around ten brands. See Supplemental Statement of Material Facts in Dispute ("Plaintiff's Rule 56 Statement") ¶ 2; Defendants' Response to Plaintiff's Supplemental Statement of Material Facts in Dispute ("Defendants' Response to Plaintiff's Statement") ¶ 2.

One of the brands is LaCroix.

The Plaintiff is Albert Dejewski.

He worked at the Corporation, and focused on LaCroix.  His title was Vice President of Commercial Development & Engagement – LaCroix Sparkling Beverage.  See Certification of Albert Dejewski ("Plaintiff's Certification") ¶ 5; Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute ("Defendants' Rule 56 Statement") ¶ 1.

### B.   The Evidence

The evidence as relevant for now is set out here.[1]

Throughout the relevant period, LaCroix was "by far" the Corporation's "biggest selling brand."  Plaintiff's Rule 56

---

[1]   There has been some litigation about sealing evidence, principally on "confidential business information" grounds.  But nothing quoted or closely described in this Opinion and Order can plausibly be considered a candidate for sealing.

Statement ¶ 33; Defendants' Response to Plaintiff's Statement ¶ 33.

During 2019, the Corporation was changing LaCroix's cans.  See Plaintiff's Rule 56 Statement ¶¶ 35-38; Defendants' Response to Plaintiff's Statement ¶¶ 35-38; Defendants' Rule 56 Statement ¶¶ 23-26; Response to Statement of Material Facts Allegedly Not in Dispute ("Plaintiff's Rule 56 Response") ¶¶ 23-26.

The Corporation wanted to no longer sell LaCroix in any cans that potentially contained a particular chemical, often known as BPA.  See Plaintiff's Rule 56 Statement ¶¶ 35-36; Defendants' Response to Plaintiff's Statement ¶¶ 35-36.

A core reason for making the change: "consumer concerns about BPA."  Undated internal Corporation email, at NBC 00500.  These loomed especially large "because of [LaCroix's] commitment to excluding unwanted ingredients and because of the preferences of its health-conscious consumers."  Id. at NBC 00501.

*     *     *

The key events here took place over three days in 2019, on April 9, April 10, and April 11.[2]

Start with April 9.

---

[2]  From here, the facts are drawn mainly from deposition transcripts, emails, and texts.  In the Court's presentation of this evidence, it makes a difference that it is the Defendants that have moved for summary judgment.  This is because "the court must view all of the facts in the record in the light most favorable to the non-moving party" --- here, the Plaintiff --- "and rule, as a matter of law, based on those facts."  Romero v. Ahsan, 827 F. App'x 222, 228 (3d Cir. 2020).  As to drawing out inferences from the facts, it also matters that it is the Defendants that have moved.  "Because this case arises in the posture of a motion for summary judgment, [the Court is] required to . . . draw all reasonable inferences in favor of the nonmoving party," the Plaintiff.  Brosseau v. Haugen, 543 U.S. 194, 195 n.2 (2004); see also Harlow v. Fitzgerald, 457 U.S. 800, 816 n.26 (1982) ("In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party.").

On that day, certain employees of the Corporation were in a
meeting.  See Deposition of Kate Zelenka ("Zelenka Dep.") at
183:13-15.  One of the employees in the meeting was a consumer
analyst ("the Analyst"[3]).  See id. at 183:13-15.  Another was a
senior marketing executive ("the Senior Marketing Executive"[4]).
See id.

While the meeting was underway, a senior marketing manager ("the
Senior Marketing Manager"[5]) came in.  She had apparently "just"
been in a meeting with, among others, the President of the
Corporation.  See Zelenka Dep. at 183:5-13.

Per the Senior Marketing Manager: "[the President] wants us to
go ahead and put on the website that we're BPA free."  Zelenka
Dep. at 183:12-17.[6]

On hearing this, the Analyst testified, she and the Senior
Marketing Executive became "alarmed[,] because to our knowledge
we weren't BPA free yet."  Id. at 183:18-19.

The Senior Marketing Executive then told the Analyst to contact
the Plaintiff, to see if he (the Plaintiff) could get the
President not to issue a "BPA free" statement.  See id. at
183:21-25.[7]   The message the Senior Marketing Executive

---

[3]  The Analyst is Kate Zelenka.  Her title was Consumer Insights
Analyst.  See Defendants' Rule 56 Statement ¶ 21; Plaintiff's
Rule 56 Response ¶ 21.

[4]  The Senior Marketing Executive is Tammera Atkins.  Her title
was Vice President of Sales and Marketing.  See Motion for
Summary Judgment at 4; Complaint ¶ 26.

[5]  The Senior Marketing Manager is Traci LoMonaco.  Her title was
Senior Marketing Manager.  See Defendants' Rule 56 Statement ¶
14; Plaintiff's Rule 56 Response ¶ 14.

[6]  The quoted text is from the Analyst's deposition.  It is the
Analyst's recollection of what the Senior Marketing Manager
said.  It does not purport to be a verbatim recollection.  Cf.
Deposition of Traci LoMonaco at 75:13-77:9.

[7]  The Plaintiff was, as noted, Vice President of Commercial
Development & Engagement – LaCroix Sparkling Beverage, and the
BPA discussions focused on LaCroix.  Per the Analyst: "[w]e felt
like [the Plaintiff] could communicate [that the BPA free
statement would be inappropriate] to [the President] and try to
figure out a new solution that wouldn't be putting that on the
website.  Yeah, we thought [the President] and [the Plaintiff]

4

apparently wanted the Plaintiff to convey to the President: "we really shouldn't be putting this on the website yet when we're not totally BPA free." Id.[8]

The Analyst then called the Plaintiff, who said he would "bring this up" with the President. See id. at 184:2-7.

Also, the Analyst (at 5:14pm) and the Plaintiff (a bit later) texted back and forth:

> 5:14pm
>
> Saying we are BPA Free when we are not.  This truly feels like an integrity issue now.
>
> 5:23pm
>
> Yup.  I will clearly communicate that.

Plaintiff's Rule 56 Statement ¶¶ 48-49; Defendants' Response to Plaintiff's Statement ¶¶ 48-49.

The Plaintiff tried to call the President but did not get through.  See April 2019 email including the Plaintiff and President, at AD_00026 (describing these efforts).

The Plaintiff then sent the President an email, on April 10. See id. at AD_00026-28.  Soon after, the President emailed back. See id. at AD_00026-27.  The content of the emails is discussed below, in Part III.C.

---

could hash that out." Zelenka Dep. at 187:25-188:7; see also Deposition of Tammera Atkins at 68:14-24.

[8]  The broader background to all of this was the interaction between (a) the Corporation's transition to an end-state in which all LaCroix cans contained no possible BPA, and (b) how to publicly describe the transition while it was underway.  For example, contemporaneous materials circulated within the Corporation suggested that new productions of LaCroix cans had become entirely free of BPA, while some older inventory was not; to some leaders inside the Corporation, this implied that until the older cans were "s[old] through," the appropriate public communications approach was to say that LaCroix cans were "Produced without BPA," not that they were "BPA free."  See, e.g., April 2019 email chain including, among others, the President, at NBC 01261-NBC 01263.

On the next day, April 11, the Plaintiff was fired.  See
Deposition of Albert Dejewski ("Plaintiff's Dep.") at 110:23-25.

### C.   The Lawsuit

The Plaintiff sued the Defendants.[9]

The Plaintiff sued under a New Jersey law, the New Jersey
Conscientious Employee Protection Act ("the New Jersey CEPA").
See Complaint ¶¶ 33-38.

The Plaintiff's contention: he was a whistleblower within the
meaning of the New Jersey CEPA, and therefore his firing was
illegal.[10]  See Complaint ¶¶ 34-38.

---------

[9]  Recall that the Defendants are the Corporation and the
President.

[10]  Three things.  First, jurisdiction.  The Defendants removed
this case here from state court in 2019.  They cited the
diversity statute as the basis for federal subject matter
jurisdiction, see Notice of Removal ¶ 10, and indicated that the
various parties had their residences in an appropriately diverse
set of states.  See id. at ¶¶ 5-7.  But the diversity statute
focuses on the parties' citizenship, not their residence.  See
Everhart v. Huntsville Female Coll., 120 U.S. 223, 224 (1887).
In 2023, this case was reassigned to the undersigned, and soon
thereafter the Court raised the citizenship/residence issue.
See generally e.g., Gonzalez v. Thaler, 565 U.S. 134, 141 (2012)
("When a requirement goes to subject-matter jurisdiction, courts
are obligated to consider sua sponte issues that the parties
have . . . not presented."); Henderson ex rel. Henderson v.
Shinseki, 562 U.S. 428, 434 (2011) ("federal courts . . . must
raise and decide jurisdictional questions that the parties
either overlook or elect not to press").  In response, the
Defendants filed a letter indicating that the various parties
were in fact citizens of different states.  See Letter (July 3,
2023).  That is sufficient.  See, e.g., J & R Ice Cream Corp. v.
California Smoothie Licensing Corp., 31 F.3d 1259, 1265 (3d Cir.
1994).  A second thing.  The parties explicitly assume
throughout their briefs that the New Jersey CEPA controls this
case, and not the law of, for example, another state.  That is
enough to establish that the CEPA governs here.  See Smith v.
CitiMortgage, Inc., 2023 WL 7619155, at *3 (D.N.J. Nov. 14,
2023); Marino v. Brighton Gardens of Mountainside, 2023 WL

D.   <u>**This Motion**</u>

Discovery has been completed, and the Defendants now move for summary judgment.

They argue there is insufficient evidence as to certain required elements of the New Jersey CEPA.  <u>See</u> Motion for Summary Judgment at 14-28.

The Defendants also press an in-the-alternative argument.  If their summary judgment motion is not granted, the Defendants contend, their damages here should be limited.  <u>See</u> <u>id</u>. at 28-30.

The Defendants' motion is before the Court.

E.   <u>**The Court's Approach**</u>

After a brief discussion of the standards for assessing summary judgment motions, <u>see</u> Part II, the Court analyzes each of the four reasons that, per the Defendants, their summary judgment motion should be granted.

The Court's conclusion: these are not persuasive.  <u>See</u> Part III.

The Court then considers the Defendants' argument for limiting the Plaintiff's available damages.  That argument, the Court concludes, is also not persuasive.  <u>See</u> Part IV.

Accordingly, the Defendants' summary judgment motion is denied. <u>See</u> Part V.

II.  <u>**Summary Judgment Standards**</u>

The Defendants, as noted, have moved for summary judgment.

Such motions should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Dupree</u> v. <u>Younger</u>, 598 U.S. 729, 737 (2023);

---

6366013, at *2 (D.N.J. Sept. 29, 2023).  <u>Third</u> and finally, in addition to a claim under the New Jersey CEPA, the Plaintiff alleged a breach of the implied covenant of good faith and fair dealing.  <u>See</u> Complaint ¶¶ 41-47.  That claim has been withdrawn.  <u>See</u> footnote 25.

Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023).

"A factual dispute is material if it might affect the outcome of the suit under the governing law." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Such a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]" SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 203-204 (3d Cir. 2022) (cleaned up).

In assessing a summary judgment motion, "a district court may not make credibility determinations or engage in any weighing of the evidence[.]" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004). Rather, the court must "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." Canada, 49 F.4th at 345 (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).

## III. **The New Jersey CEPA**

As noted, the Plaintiff has sued under the New Jersey CEPA. See Complaint ¶¶ 33-39.

In interpreting the New Jersey CEPA, "this Court's role is to apply the law as the New Jersey Supreme Court has set it out." Howard v. Wells Fargo Bank, N.A., 2024 WL 2044622, at *2 (D.N.J. May 8, 2024).

Per the New Jersey Supreme Court, a plaintiff must show that "(1) he . . . reasonably believed that his . . . employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he . . . performed a 'whistle-blowing activity' . . .; (3) an adverse employment action was taken against him . . .; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action." Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).

The Defendants argue that certain of these elements have not been satisfied, and seek summary judgment on that basis. See Motion for Summary Judgment at 14-28.

This argument is in four parts and is taken up below.

A.     "Reasonably Believes"

The New Jersey CEPA covers employees who "[o]bject[]
to . . . any activity, policy or practice which the employee
reasonably believes," N.J. Stat. § 34:19-3(c)(2), is wrongful.

The Defendants argue that a reasonable jury could not conclude
that the Plaintiff knew enough from his April 9 interactions
with the Analyst, see Part I.B, to form a "reasonable belie[f]"
that the Corporation was about to falsely announce that all the
LaCroix cans were BPA free. See Motion for Summary Judgment at
19-24; see generally Eastman Kodak Co. v. Image Tech. Servs.,
Inc., 504 U.S. 451, 462 (1992) (for a nonmoving party "to defeat
a motion for summary judgment . . . a reasonable trier of fact
must be able to find" the relevant elements are satisfied);
Sharpe v. Medina, 450 F. App'x 109, 113 (3d Cir. 2011) ("To
avoid summary judgment, the nonmoving party must produce
evidence such that a reasonable jury could return a verdict for
him.") (cleaned up).

Evaluating this argument boils down to two questions.

The first: could a reasonable jury, see Eastman Kodak, 504 U.S.
at 462, conclude that the Plaintiff "reasonably believe[d],"
N.J. Stat. § 34:19-3(c)(2), that the Corporation was about to
publicly announce that LaCroix was BPA free?

The Court's answer: yes.

The testimony is that the President told the Senior Marketing
Manager (and others) that such an announcement was being made,
see Zelenka Dep. at 183:10-17; that "just" afterward the Senior
Marketing Manager told both the Senior Marketing Executive and
Analyst what the President had said, see id.; that the Analyst
then spoke to the Plaintiff, see id. at 185:8-24, to ask him to
speak to the President to get him "to change his mind," id. at
183:21-25; and that the Plaintiff then agreed to "bring this up"
with the President, id. at 184:1-7.

The Plaintiff is entitled at this stage to "all reasonable
inferences" from the above.[11]

---

[11] See, e.g., Goldenstein v. Repossessors Inc., 815 F.3d 142,
146 (3d Cir. 2016) ("When deciding a motion for summary

And one of those inferences is that the Analyst told the Plaintiff what she (the Analyst) and the Senior Marketing Executive had just heard from the Senior Marketing Manager --- namely, that the President was planning to make a BPA free announcement as to LaCroix.[12]

This is dispositive as to the first part of the "reasonable belie[f]" equation.

When the President of a Corporation says the Corporation will put a statement on its website, that is more than enough "reason[]" to "belie[ve]" the statement will go up.

The second question: could a reasonable jury, see Eastman Kodak, 504 U.S. at 462, conclude that the Plaintiff "reasonably believe[d]," N.J. Stat. § 34:19-3(c)(2), that at least some LaCroix cans, see footnote 8, still contained BPA, even as an unqualified BPA-free announcement was assertedly being contemplated?

The Court's conclusion: again, yes.

---

judgment, all reasonable inferences from the record must be drawn in favor of the nonmoving party.") (cleaned up); Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 162 (3d Cir. 2001) ("In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party."); Bradley v. W. Chester Univ. of Pennsylvania State Sys. of Higher Educ., 880 F.3d 643, 650 (3d Cir. 2018) ("When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the nonmoving party.").

[12]   The Defendants do not try to argue that drawing this inference would be a bridge too far.  And with good reason.  The Analyst called the Plaintiff all-but "immediately" after she and the Senior Marketing Executive had heard from the Senior Marketing Manager.  See Deposition of Tammera Atkins at 66:1-7; cf. Zelenka Dep. at 183:21-184:7.  It is unlikely that the Analyst would ask the Plaintiff to speak to the President of the Corporation, or that the Plaintiff would agree to do so, without the Analyst providing a detailed explanation of what had just transpired.

There is evidence that the Analyst and the Senior Marketing
Executive thought so.  See Zelenka Dep. at 183:18-19 (testimony
that they were "alarmed[,] because to our knowledge we weren't
BPA free yet"); cf. Deposition of Tammera Atkins at 68:5-13.

And it is a reasonable inference that this shared understanding
was conveyed to the Plaintiff.  See footnote 12.

In turn, a reasonable jury could conclude that the Plaintiff's
knowledge of this shared understanding gave him a solid-enough
basis for believing that all of LaCroix's cans were not, in
fact, BPA free.

Why?  Because the Senior Marketing Executive was in a good
position to know where things stood as to BPA and the LaCroix
cans.[13]

First, the Senior Marketing Executive was a senior executive of
the Corporation, see Motion for Summary Judgment at 4, and the
BPA question was an important issue for it.  LaCroix was "by
far" the Corporation's "biggest-selling brand."  Plaintiff's
Rule 56 Statement ¶ 33; Defendants' Response to Plaintiff's
Statement ¶ 33.  And there is ample evidence that the status of
the change-over to BPA was a front-and-center issue for the
Corporation's senior leaders.  See April 2019 email
conversation, at NBC 01261-NBC 01263 (Corporation leaders
discussing the issue); Zelenka Dep. at 183:10-20 (same);
Deposition of Michael King at 20:22-21:10 (same); April 2019
email conversation, at NBC 00500-NBC 00505 (same).

Second, and more importantly, the Senior Marketing Executive was
a leader of the marketing group.  And inside the Corporation,
the BPA issue was thought of in meaningful part as a
marketing/customer communications issue.[14]  Accordingly, the
marketing group was closely involved in the BPA issue.[15]  And as

---

[13]  Given this conclusion, there is no need to assess whether the
Analyst was in a good-enough position to know.

[14]  See, e.g., April 4, 2019 email, at NBC 00063; Undated email,
at NBC 00500; Deposition of Michael King at 20:22-21:10; April
8, 2019 email, at NBC 01428-29.

[15]  See, e.g., April 8, 2019 email, at NBC 01428-29; Zelenka Dep.
at 183:10-13, 183:21-25; April 1, 2019 email, at NBC 00503-04;
April 24, 2019 email, at NBC 01261.

11

part of that involvement, members of the marketing group ---
including the Senior Marketing Executive herself --- were on
numerous occasions part of detailed discussions as to whether
all LaCroix cans were or were not yet fully BPA-free.[16]

There is no reason to think any of this would have been obscure
to the Plaintiff, the then-Vice President of Commercial
Development & Engagement – LaCroix Sparkling Beverage.

And given this backdrop, a "reasonable jur[or]," SodexoMAGIC,
LLC, 24 F.4th at 203-204, could readily conclude that the
Plaintiff was justified in forming a "reasonabl[e] belie[f],"
Dzwonar at 177 N.J. at 462, that not all LaCroix cans were BPA
free.  He based his view in part on the Senior Marketing
Executive's understanding.  And it was reasonable to believe
that she was well-enough informed to be relied on.[17]

---

[16]  An example.  On April 9, the day before the key events here,
the President emailed a Corporation executive responsible for
"strategic sourcing," to ask when the Corporation could say
LaCroix was "BPA free."  The Senior Marketing Executive was
cc:ed on the email by the President, and the strategic sourcing
executive replied-all back to the full group --- with a detailed
and seemingly all-but real-time update as to the progress of the
transition toward the ultimate goal of all LaCroix cans having
no possible BPA.  See April 9, 2019 email, at NBC 01262-63.  For
other examples along these lines, see (a) an April 1, 2019 email
from the Senior Marketing Manager, cc:ed to the Analyst, noting
the "current[]" status of LaCroix cans/BPA, see NBC 00504, and
(b) the multi-page "complete . . . accounting of the fairly
complicated BPA can issue and how LaCroix has handled [it],"
sent from the strategic sourcing executive to, among others, the
Senior Marketing Manager, see NBC 00500.

[17]  To borrow from a key New Jersey Supreme Court CEPA decision,
"[i]n summarizing the complaints against [the Corporation and
the President], [the Court] make[s] no judgment regarding their
validity and impl[ies] no wrongdoing on anyone's part."  Est. of
Roach v. TRW, Inc., 164 N.J. 598, 604 (2000).  The question here
is not whether there was wrongdoing.  Rather, it is whether a
reasonable jury could opt to conclude that the Plaintiff had
enough to go on --- that the Plaintiff's apparent belief that
wrongdoing was afoot was a reasonable one.  That the answer to
this question is "yes" does not speak to whether there was, in
fact, wrongdoing.

**B.   The Statute**

The Defendants' next argument: "[the Plaintiff] cannot identify how . . . discussion about posting information on BPA on [the Corporation's] website would _violate_ . . . state fraud statutes."  Motion for Summary Judgment at 24 (emphasis added).

But this sets the bar too high.

Under the New Jersey CEPA, a plaintiff does not have to push all the way over the line and establish an underlying legal violation.  See, e.g., Dzwonar, 177 N.J. at 463 (a plaintiff need not "allege facts that, if true, actually would violate that statute, rule, or public policy").

Rather, a plaintiff can satisfy the New Jersey CEPA by showing "a substantial nexus between the complained-of conduct and a law . . . identified by . . . the plaintiff."  Id. at 464.

Here, the "substantial nexus" test is met.

The Plaintiff has pointed to, among other sources of law, the New Jersey Consumer Fraud Act.  See Complaint ¶ 1.[18]

The Consumer Fraud Act prohibits "any commercial practice that is . . . [a] misrepresentation . . . in connection with the sale or advertisement of any merchandise." N.J. Stat. § 56:8-2; see also Gennari v. Weichert Co. Realtors, 148 N.J. 582, 607–08 (1997) (holding that a misrepresentation can be actionable under the Consumer Fraud Act even without reliance on the misrepresentation).

The Act is designed to be "construed liberally in favor of consumers."  Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994).

And it applies to false or misleading statements made on a website.  See, e.g., Lee v. Carter-Reed Co., 203 N.J. 496, 507–510, (2010) (Consumer Fraud Act class should be certified, because the defendant allegedly touted "false" benefits of a drug through a variety of forms of media including "on its website" and in internet advertisements); Hoffman v. Loiry, 2016 WL 3693957, at *1-2, *7 (N.J. Super. Ct. App. Div. July 13,

---

[18]  Regardless of whether the Plaintiff needed to identify a particular statute, the New Jersey Supreme Court has suggested that doing so is the "better practice."  Chiofalo v. State, 238 N.J. 527, 544 (2019).

2016) (Consumer Fraud Act liability established where "defendant
made affirmative false statements or misrepresentations" through
email and the defendant's websites); <u>Smajlaj</u> v. <u>Campbell Soup
Co.</u>, 782 F. Supp. 2d 84, 105 (D.N.J. 2011) (plaintiff stated a
Consumer Fraud Act claim where there were alleged
misrepresentations on the defendant's website and product
package).

Using a company website to suggest to potential consumers that a
product line is one thing (fully BPA free) if it was, in fact,
not --- that would go a long way to a
"misrepresentation . . . in connection with [a] sale or
advertisement" covered by the Consumer Fraud Act.   Perhaps not
all the way to the end of the road, to liability under the Act.
But certainly well past the marker set down by the CEPA
"substantial nexus" test.   <u>See</u> <u>generally</u> <u>Dzwonar</u>, 177 N.J. at
464 (there must be "a substantial nexus between the complained-
of conduct and a law . . . identified by . . . the plaintiff").

### C.   Objecting

The Defendants' next argument is that the Plaintiff did not
"object" to the posting of the assertedly false BPA statement,
as required under the New Jersey CEPA.   <u>See</u> Motion for Summary
Judgment at 16-19 (citing N.J. Stat. Ann. § 34:19-3, which bars
retaliation where an employee "objects to" certain
"activit[ies]," "polic[ies]," or "practice[s]").

But this is not persuasive.

In the relevant April 10 email, the Plaintiff told the President
that he wanted to discuss four topics, including "BPA
Packaging."   April 10, 2019 email, at AD_00026.   And the
Plaintiff stated that he wanted to discuss a communications
approach to "[c]onsumers" as to a "BPA-free beginning once we
are 100% converted at the FG inventory level in all plants."
<u>Id.</u> at AD_00027 ("FG" stands for "finished goods."   Plaintiff's
Dep. at 308:20-21.)

This was not an entirely explicit objection.

But the Plaintiff is entitled to all reasonable inferences at
this stage.   <u>See</u> footnote 11 (collecting cases).

And one possible (and reasonable) inference that a jury could
opt to draw is that the just-quoted parts of the email amounted
to an objection, and were understood that way.

To begin seeing why, recall that the day before, the President had assertedly said he wanted to publicly announce that LaCroix cans no longer had BPA --- even though, the Plaintiff believed, the transition to non-BPA cans was not yet fully completed.  See Part III.A.

Telling the President on the next day that public communications should take place "once we are 100% converted" could be reasonably interpreted by a jury as an objection to the asserted decision to make an announcement before 100% conversion.

And a reasonable jury could find that the Plaintiff's email was understood that way by the President.[19]

The President, the jury could conclude, well understood what the Plaintiff was objecting to --- the decision that he (the President) had announced the day before, in a meeting the Plaintiff did not attend.  See Zelenka Dep. at 183:10-13.  Indeed, the President's response to the Plaintiff's email emphasized that the Plaintiff had not been at the relevant meeting:

> Don't know how you heard about BPA, but tell your source if they want to stay with the company, what's said in Ft Lauderdale, stays in here!

April 10, 2019 email at AD_00026.

Also, note that part of the complexity in the overall BPA transition was apparently the need to work through plant-by-plant can conversions and to go through old can inventory.  See footnote 16.  The Plaintiff's April 10 email plainly alluded to this: "once we are 100% converted at the F[inished] G[oods] inventory level in all plants."

In addition to the above, a reasonable jury could find that the President understood that the Plaintiff was suggesting that he (the President) was engaged in wrongful conduct.

That would explain, the jury could conclude, three things.

---

[19]  Per the New Jersey Supreme Court, a relevant consideration in this context is whether an employee's statement "would . . . have put [the employer] on notice that plaintiff was trying to blow the whistle." Battaglia, 214 N.J. at 560.

First and least importantly, why the BPA reference in the Plaintiff's email caught the President's eye.

The Plaintiff's email to the President was over 850 words long, and only the above-quoted 20 or so words focused on BPA.  But what might have been a needle in a haystack instead stood out. When the President responded to the Plaintiff's email, about 35 minutes after it was sent, around 1/4 of the President's response focused on BPA.

Second, the President's understanding that an objection of a pointed and serious kind was being made helps to explain why the President emphatically said that the Plaintiff's objection should not be broadly discussed ("tell your source if they want to stay with the company, what's said in Ft Lauderdale, stays in here!").

And third, the President's understanding of the sharp nature of the Plaintiff's objection helps to explain why an employee who brought up BPA on one day was fired on the next.  Indeed, when the Plaintiff was fired, he testified, the President conveyed a message along the lines of "your e-mail went too far, you shouldn't have said BPA . . . . your e-mail went too far including BPA[.]"  Plaintiff's Dep. at 112:18-21, 113:5-7.

Bottom line: a reasonable jury could look to the April 10 email and the surrounding events and conclude that the Plaintiff was understood by the President to be "objecti[ng]," N.J. Stat. Ann. § 34:19-3, to an assertedly illegal decision --- that is, to the decision to publicly suggest that all the LaCroix cans were BPA free when, it was believed by the Plaintiff, that was not the case.

### D.   Insubordination

Finally, the Defendants argue that the Plaintiff's New Jersey CEPA claim must fail because he was fired for being insubordinate, not because he objected to any plans as to a BPA announcement.  See Motion for Summary Judgment at 24-28.

This, too, is not persuasive.

To make out a claim under the New Jersey CEPA, a plaintiff "need only prove that retaliation played a role in the decision and that it made an actual difference in defendant's decision." Puglia v. Elk Pipeline, Inc., 226 N.J. 258, 283 (2016) (emphasis in original) (cleaned up).  A plaintiff need not prove that it was the sole motivating factor.  See id.

16

Here, there is ample evidence, described in the preceding sections, from which a reasonable jury could infer that the Plaintiff was fired, at least in part, because he objected to the BPA announcement.  And it bears noting that the Plaintiff has testified that he was explicitly told as much.  See Plaintiff's Dep. at 112:18-21 ("your e-mail went too far, you shouldn't have said BPA").

The Defendants' core response is that BPA played no "role," Puglia, 226 N.J. at 283 --- the Plaintiff was fired, the argument goes, because his April 10 email was "insubordinate," in that it suggested a number of very far-reaching changes at the Corporation.  See Motion for Summary Judgment at 24-28.

But there is real evidence here that the Plaintiff's BPA objection "made an actual difference," Puglia, 226 N.J. at 283, and when that is the case, New Jersey law is clear: the evidentiary sifting (why was the Plaintiff fired?) is not to be taken away from the jury, and summary judgment must be denied. See, e.g., Maimone v. City of Atl. City, 188 N.J. 221, 237-38 (2006) (holding that CEPA liability is a jury question when, among other evidence, the employee was transferred soon after raising complaints and was told "you're asking for it," and the employer submitted evidence of an alternative reason for the transfer); Est. of Roach, 164 N.J. at 604-606, 611-612 (holding that CEPA liability is a jury question where the employer put forward evidence there was a legitimate reason for laying off the employee); Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 94-96, 101 (2000) (holding that CEPA liability is a jury question where the employee was fired after making a particular objection and the employer suggested in response that she was fired because of how she reported the misconduct, along with poor job performance).[20]

---

[20]  Courts applying New Jersey law have sometimes suggested that an "object[ion]" can be expressed in so inappropriate a way that the protections of the CEPA may not be available.  See, e.g., Haworth v. Deborah Heart & Lung Ctr., 271 N.J. Super. 502, 506 (App. Div. 1994) (employee not protected by the CEPA where the employee destroyed patients' blood samples to object to a policy); Davila v. City of Camden, 66 F. Supp. 3d 529, 538 (D.N.J. 2014) (police officer not protected by the CEPA where he objected during a roll call meeting, disrupting the meeting, and there was not evidence that the retaliation was based on content).  But that is not this case.  The Plaintiff wrote an email, and he wrote it just to the President.  And there is

*     *     *

The Defendants have pressed four arguments as to why they are entitled to summary judgment.  As set out above in Part III.A, III.B, III.C, and III.D, none of these arguments move the needle.  The Defendants' summary judgment motion is therefore denied.

## IV.   **Front-Pay Damages**

Having determined it will deny the summary judgment motion, see Part III, the Court briefly considers the Defendants' in-the-alternative argument --- that the Plaintiff should be barred from getting front-pay damages[21] because after he was fired, the Defendants discovered information that would have led them to terminate him.  See Motion for Summary Judgment at 28-30.[22]

The stepping-off point for this argument is New Jersey's after-acquired-evidence doctrine, which "allows employers to escape or limit liability for an unlawful termination by introducing evidence of an employee's wrongdoing that the employer discovers after its decision to terminate the employee."  Nicosia v. Wakefern Food Corp., 136 N.J. 401, 417 (1994) (emphasis in original); see also Cedeno v. Montclair State Univ., 163 N.J. 473, 479 (2000) (employer not liable under the CEPA where after-acquired evidence shows employee had been legally ineligible for the job at issue).

Here, the Defendants introduce after-acquired evidence that (a) the Plaintiff was looking for other employment while working for

---

nothing here that is analogous to destruction of property (as in Haworth) or of a workplace disruption (as in Davila).

[21]  Front pay is "a claim for future lost wages."  Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 135 (1999).

[22]  There are two ways to understand this argument, and the Defendants do not say which approach they wish the Court to take.  Understood as a pre-trial motion in limine, the Defendants' argument would be denied as coming too early.  It is not ripe.  On the other hand, the Defendants' argument could be understood as a narrow-gauge summary judgment argument --- for summary judgment as to one particular issue, the availability of front-pay damages.  That is how the Court understands the Defendants' argument.  Therefore, the Court analyzes it in light of the summary judgment standards set out in Part II.

the Corporation,[23] and (b) he shared confidential information with a rival company.[24]  And through an affidavit from the President, the Defendants work to prove that the Plaintiff would have been fired for these reasons.  <u>See</u> Declaration of Joseph Caporella ¶¶ 5-6.

But there is evidence on the other side of the ledger as to each of (a) and (b).

The Plaintiff's affidavit says that he did not actively search for a job before he was fired, but just spoke to recruiters.  <u>See</u> Certification of Albert Dejewski ¶¶ 22-23.

And the Plaintiff testified that he never provided any documents to outside entities containing confidential or proprietary information.  <u>See</u> Plaintiff's Dep. at 159:23-161:9; 162:8-163:7.

These factual disagreements are material, and they preclude granting the Defendants' front-pay motion.  <u>See</u>, <u>e.g.</u>, <u>Gorman</u> v. <u>Meeder Fin. Servs., Inc.</u>, 2007 WL 1657188, at *8-9 (D.N.J. June 5, 2007) (jury question whether employer would have fired employee because he was working for possible competitor in potential violation of company policy); <u>Mackey</u> v. <u>Bd. of Pensions of United Methodist Church</u>, 1993 WL 11674, at *3 (N.D. Ill. Jan. 15, 1993) (jury question whether employer would have fired employee for removing documents where defendants could not show that this violated a company policy).

## V.  <u>Conclusion</u>

The Defendants' overarching summary judgment motion is denied, <u>see</u> Part III, as is the part of their motion that focuses on front pay, <u>see</u> Part IV.[25]

---

[23]  <u>See</u>, <u>e.g.</u>, Plaintiff's Dep. at 149:9-22.

[24]  <u>See</u>, <u>e.g.</u>, June 2019 email, at KITU 00024-29.

[25]  The Plaintiff also alleged a breach of the implied covenant of good faith and fair dealing.  <u>See</u> Complaint ¶¶ 41-47.  The Defendants moved for summary judgment as to that claim, <u>see</u> Motion for Summary Judgment at 30-35, and the Plaintiff voluntarily withdrew the claim with prejudice.  <u>See</u> Opposition Brief at 14 n.6.  In light of this withdrawal, the Defendants' motion is granted as to the Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  <u>See</u> <u>Marino</u>, 2023 WL 6366013, at *13; <u>Badalamenti</u> v. <u>Borough of Westville</u>, 2014 WL 4798617, at *6 (D.N.J. Sept. 26, 2014); <u>Antiskay</u> v.

It is on this 29th day of May, 2024 **SO ORDERED.**

_____
Michael E. Farbiarz, U.S.D.J.

---

Contemp. Graphics & Bindery Inc., 2013 WL 6858950, at *3 (D.N.J. Dec. 26, 2013); Finizio v. Harrah's Atl. City Operating Co., LLC, 2013 WL 12134140, at *1 (D.N.J. Oct. 28, 2013); Durham v. Atlantic City Elec. Co., 2010 WL 3906673, at *11 (D.N.J. Sept. 28, 2010).